UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

ARANTZA ESPINOZA,                                         CASE NO.

      Plaintiff,

vs.

Madison Reed, INC.,
D/B/A Madison Reed Color Bar
a Foreign for Profit Corporation

      Defendant,
_____/

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF, AND JURY TRIAL DEMAND**

Plaintiff, ARANTZA ESPINOZA, through undersigned counsel, sues Defendant, Madison Reed, INC., a foreign corporation d/b/a Madison Reed Color Bar (hereinafter referred to as "Madison Reed"), for declaratory and injunctive relief, and damages, and alleges as follows:

1)   This action is brought under Title III of the Americans with Disabilities Act ("ADA"), that is codified in 42 U.S.C. §§12181-12189.

2)   This action is also brought pursuant to 28 C.F.R. Part 36.

3)   This Court has jurisdiction over this case based on federal question jurisdiction, as provided in 28 U.S.C. §1331 and the provisions of the ADA.

4)   Furthermore, because this Court has jurisdiction over the ADA claim, the Court has supplementary jurisdiction over Plaintiff's common law tort claim pursuant to 28 U.S.C. §1367.

5)   Plaintiff is sui juris, and she is disabled as defined by the ADA and ADA Amendments Act of 2008, 42 U.S.C. §12101 ("ADAAA").

6) Defendant, Madison Reed is a foreign California corporation authorized to do business and doing business in the State of Florida.

7) Defendant, Madison Reed is a company that provides hair services and sells hair color, highlights, quick fixes for grays, color care products, hair treatments, styling tools, accessories, styling products, men's hair color, bundles, and sets. There is a retail location in Broward County.

8) Plaintiff seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

9) Plaintiff desires to prevent discrimination and demands equal access to Defendant's internet website to purchase professional color tool kit and hair care bundle.

10) Plaintiff also seeks declaratory and injunctive relief for trespass against the Plaintiff's computer. The computer is Plaintiff's personal property, and a claim for trespass attached to same.

11) The Defendant is also liable for compensatory damages to Plaintiff as a result of the trespass to Plaintiff's personal property.

12) The remedies provided under common law for trespass are not exclusive, and same may be sought in connection with suits brought under the ADA.

13) Venue is proper in the Southern District of Florida, Miami-Dade Division, since all events, actions, injuries, and damages complained of herein occurred in the Southern District of Florida.

14) Furthermore, Plaintiff is a resident of Miami-Dade County which falls within the Miami Division of the Southern District of Florida.

15) At all relevant times, Plaintiff is and was visually impaired and has Leber Congenital Amaurosis since birth that substantially impairs Plaintiff's vision.

16) Plaintiff's visual impairment interferes with her day-to-day activities and causes limitations in visualizing their environment. As such, Plaintiff is a member of a protected class

under the ADA, 42 U.S.C. § 12102(1) - (2), the regulations implementing the ADA set forth at 28 CFR §§ 36.101, et seq., and in 42 U.S.C. 3602, §802(h).

17) Plaintiff regularly uses the computer, but she needs the assistance of special software for visually impaired persons. The software that she uses is screen reader software that is readily available commercially.

18) Defendant is a private entity which owns and operates retail locations. The stores are open to the public, and each of Defendant's locations is defined as a "public accommodation" within the meaning of Title III of the ADA because Defendant is a private entity which owns and/or operates "[A] bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment," per 42 U.S.C. §12181(7)(E) and 28 C.F.R. §36.104(2).

19) Defendant's website is a place of public accommodation per 42 U.S.C. Section 12181(7)(E) because it's an extension of Defendant's brick and mortar stores. The public is able to, among other things, view the products available at defendant's locations provides hair color and highlights, quick fixes for grays, color care and hair treatments, tools and accessories, styling products, men's hair color, bundles, and sets through defendant's website, subscribe to Defendant's newsletter, subscribe to obtain $15 discount, create an account and register to track orders, create a wish list, and learn the story behind Defendant's brand, how to guide and advertising campaigns.

20) Since the Defendant's website is a public accommodation, it must comply with the requirements of the ADA. The website cannot discriminate against individuals with disabilities.

21) Plaintiff is a customer of Defendant who is and was interested in purchasing hair products through Defendant's website and at Defendant's stores and visiting Defendant's brick and mortar locations.

22) Plaintiff is not able to visit the physical locations without the assistance of a family member or caretaker, so the ability to purchase merchandise on Defendant's website for delivery to her home is important to her as an alternative when she is not able to visit the Defendant's stores.

23) The website also services Defendant's physical stores by providing information on its brand, sales campaigns, how to guide, and other information that Defendant is interested in communicating to its customers about its physical locations.

24) Since the website allows the public the ability to view the products available at defendant's locations, purchase hair color and highlights, quick fixes for grays, color care and hair treatments, tools and accessories, styling products, men's hair color, bundles, and sets through defendant's website, subscribe to Defendant's newsletter, create an account and register to track orders, create a wish list, and learn the story behind Defendant's brand, advertising campaigns, and how to guide, the website is an extension of, and gateway to, Defendant's physical stores. By this nexus, the website is characterized as an intangible service, privilege and advantage provided by a place of public accommodation as defined under the ADA, and thus an extension of the services, privileges and advantages made available to the general public by Defendant through its retail brick and mortar stores.

25) Because the public can view and purchase Defendant's merchandise that is also offered for sale by Defendant at its physical stores, subscribe to Defendant's newsletter, create an account and register to track orders, create a wish list, and learn the story behind Defendant's brand, advertising campaigns, and how to guide, the website is an extension of and gateway to the physical stores, which are places of public accommodation pursuant to 42 U.S.C. § 12181(7)(E). As such, the website, as an intangible service, privilege and advantage of Defendant's brick and mortar locations, must be fully accessible and in compliance with the ADA,

must not discriminate against individuals with disabilities, and must not deny full and equal enjoyment of the same services, privileges and advantages afforded to the general public both online and at the physical locations.

26) At all times material hereto, Defendant was and still is an organization owning and operating the website located at www.madison-reed.com. Since the website is open through the internet to the public as an extension of the retail stores, by this nexus the website is an intangible service, privilege and advantage of Defendant's brick and mortar locations, and Defendant has subjected itself and the associated website it created and maintains to the requirements of the ADA.

27) Plaintiff is and/or has been a customer who is interested in patronizing, and intends to patronize, Defendant's physical stores, and purchase Defendant's merchandise, sign up for Defendant's newsletter and create an account through the website and at Defendant's physical stores.

28) The opportunity to shop Defendant's merchandise from her home is an important accommodation for Plaintiff because traveling outside of the home as a visually disabled individual is often a difficult, hazardous, frustrating, confusing, and frightening experience. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually disabled individuals using screen reader software.

29) Like most consumers, Plaintiff accesses numerous websites at a time to compare merchandise and prices. Plaintiff may look at several dozens of sites to compare features and prices.

30) During the months of May and June, 2022, Plaintiff attempted on several occasions to utilize the website to browse through the merchandise to educate herself as to the merchandise and with the intent to make a purchase through the website or at one of Defendant's physical stores.

31) Places of public accommodation are not just brick-and-mortar structures. The United States Department of Justice and the binding case law increasingly recognize that private entities are providing goods and services to the public through websites that operate as places of public accommodation under Title III.

32) Defendant is required to make reasonable accommodations to its websites for individuals with disabilities to allow them to participate in web-based promotions and obtain goods or services via the Internet just as sighted persons are able to do.

33) Plaintiff utilized Chrome Vox ("Screen Reader Software") to attempt to purchase clothing on Defendant's website. However, the Plaintiff was not able to freely and fully use Defendant's website because it contains access barriers that make it inaccessible to persons with disabilities, and for which there is no reasonable accommodation for the Plaintiff.

34) A person who can see can enjoy the benefits and privileges provided by Defendant's website that include, but are not limited to viewing the products available at defendant's locations, purchasing hair services and hair color, highlights, color care, hair treatments, tools and accessories, styling products, bundles, and sets through defendant's website, subscribing to Defendant's newsletter, creating an account and registering to track orders, creating a wish list, and learning the story behind Defendant's brand, and advertising campaigns.

35) A person who cannot see, like the Plaintiff in this case, cannot go to Defendant's website and avail themselves of the same privileges. Thus, the Plaintiff has suffered discrimination due to Defendant's failure to provide a reasonable accommodation for Plaintiff's disability.

36) The Department of Justice has provided useful guidance regarding website accessibility under the ADA, and the binding and persuasive case law in this district has applied the Web Content Accessibility Guidelines ("WCAG") 2.0 or 2.1 to determine accessibility.

37) Defendant's website does in fact fail the following WCAG 2.0-AA Compliance standards and it does not provide sufficient alternatives to serve the equivalent purpose:

All of the following are violations of WCAG 2.1 standards which have been endorsed as an appropriate standard for complying with ADA accessibility requirements. In all cases no sufficient alternative has been provided.

Violations that prevent users from completing desired action

Violation: Labels or instructions are not provided when content requires user input.

Note/Proof: On all product pages the price of the product is not described in an audible format to the user, making the decision to purchase or not the product hard to determine ([video](#)).

Applicable WCAG 2.1 Standard at Issue: *Standard 3.3.2 Labels or Instructions (Level A).*

Nature of the Violation: required by WCAG 2.1's *Standard 3.3.2 Labels or Instructions.*

Violation: When an input error is automatically detected, the item that is in error is not described to the user in text.

Note/Proof: When creating an account to check out, and the user inputs an email that is already associated with another account, the error is not fully described in an audible format to the user ([video](#)).

Applicable WCAG 2.1 Standard at Issue: *Standard 3.3.1 Error Identification (Level A).*

Nature of the Violation: required by WCAG 2.1's *Standard 3.3.1 Error Identification.*

Violations that make it difficult to navigate through the site

Violation: A mechanism is not available to bypass blocks of content that are repeated on multiple Web pages.

Note/Proof: There is no skip to content mechanism provided, making the user cycle though the main menu options before moving on to the pages' content ([video](#) and [video](#)).

> Applicable WCAG 2.0 Standard at Issue: *Standard 2.4.1 Bypass Blocks (Level A).*
>
> Nature of the Violation: required by WCAG 2.1's *Standard 2.4.1 Bypass Blocks.*

38) Furthermore, Defendant's website does not contain accessibility assistance that would direct a visually impaired person like the Plaintiff to someone who she can contact for assistance, questions, or concerns.

39) Thus, Defendant has not provided full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations provided by and through the website, in contravention of the ADA.

40) On information and belief, Defendant is, and at all times has been, aware of the barriers to its website which prevent individuals with disabilities who are visually impaired from comprehending the information within same, and is also aware of the need to provide access to all persons who visit its site.

41) Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged in this Complaint, such that this suit for declaratory judgment and injunctive relief is her only means to secure adequate and complete redress from Defendant's discriminatory practices in connection with use of its website.

42) Notice to Defendant is not required because of Defendant's failure to cure the violations.

43) Enforcement of Plaintiff's rights under the ADA is right and just pursuant to 28 U.S.C. §§ 2201 and 2202.

44) Plaintiff has retained the undersigned attorneys to represent her in this case, and has agreed to pay them a reasonable fee for their services.

**COUNT I – VIOLATION OF THE ADA**

45) Plaintiff realleges paragraphs 1 through 44 as if set forth fully herein.

46) Defendant owns and operates the www.madison-reed.com / website, and is a public accommodation subject to the ADA pursuant to 42 U.S.C. §12181(7)(E).

47) Defendant's website is inaccessible to persons with disabilities like the Plaintiff, who is visually impaired. Plaintiff was not able to enjoy full and equal access to the information and services that Defendant has made available to the public on its website, in violation of 42 U.S.C. §12101. *et seq*, and as prohibited by 42 U.S.C. §12182 *et seq*.

48) Defendant's website is not in compliance with the ADA.

49) Defendant has made no reasonable accommodation for Plaintiff's disability.

50) A cursory review of a portion of the Defendant's website revealed that the website is not accessible to persons like the Plaintiff that are visually impaired as required by law and for which there is no sufficient alternative on Defendant's website, including:

All of the following are violations of WCAG 2.1 standards which have been endorsed as an appropriate standard for complying with ADA accessibility requirements. In all cases no sufficient alternative has been provided.

> Violations that prevent users from completing desired action
>
> Violation: Labels or instructions are not provided when content requires user input.
>
> Note/Proof: On all product pages the price of the product is not described in an audible format to the user, making the decision to purchase or not the product hard to determine ([video](video)).
>
> Applicable WCAG 2.1 Standard at Issue: *Standard 3.3.2 Labels or Instructions (Level A).*
>
> Nature of the Violation: required by WCAG 2.1's *Standard 3.3.2 Labels or Instructions.*

> Violation: When an input error is automatically detected, the item that is in error is not described to the user in text.
>
> Note/Proof: When creating an account to check out, and the user inputs an email that is already associated with another account, the error is not fully described in an audible format to the user ([video](video)).
>
> Applicable WCAG 2.1 Standard at Issue: *Standard 3.3.1 Error Identification (Level A).*
>
> Nature of the Violation: required by WCAG 2.1's *Standard 3.3.1 Error Identification.*
>
> Violations that make it difficult to navigate through the site
>
> Violation: A mechanism is not available to bypass blocks of content that are repeated on multiple Web pages.
>
> Note/Proof: There is no skip to content mechanism provided, making the user cycle though the main menu options before moving on to the pages' content ([video](video) and [video](video)).
>
> Applicable WCAG 2.0 Standard at Issue: *Standard 2.4.1 Bypass Blocks (Level A).*
>
> Nature of the Violation: required by WCAG 2.1's *Standard 2.4.1 Bypass Blocks.*

51) Due to Defendant's failure to provide an ADA compliant website, the Plaintiff has been injured since she has been denied full access to Defendant's website.

52) As a result, Plaintiff is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303 to correct the inaccessibility that leads to discrimination against visually impaired persons.

WHEREFORE, Plaintiff requests entry of judgment in her favor and against Defendant for the following relief:

A.  A declaration that Defendant's website is in violation of the ADA;

B.      An Order requiring Defendant, by a date certain, to update its website, and continue to monitor and update its website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, the website and effectively communicate with the website to the full extent required by Title III of the ADA;

C.      An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within its website, wherein the logo [1] would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations.  Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of the website;

D.      An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to insure compliance thereto.

E.      An Order directing Defendant, by a date certain to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to its website;

F.       An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for its website to insure effective communication for individuals who are visually disabled;

G.      An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's website to be fully accessible to the visually disabled;

H.      An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or

code for, or who publish final content to, Defendant's website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I.  An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of its website to identify any instances where the website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review.

J.  An Order directing Defendant, by a date certain, to make publicly available and directly link from its website homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of its website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems.

K.  An award to Plaintiff of her reasonable attorney's fees and costs pursuant to in 42 U.S.C. §§12181-12189, and pursuant to such other laws and statutes that may apply, and further relief as the Court deems just and equitable.


[1]

## COUNT II – TRESPASS

53)  Plaintiff realleges paragraphs 1 through 44 as if set forth herein.

54) Defendant's website contains software analytics. Since Plaintiff has navigated Defendant's website as stated herein, Plaintiff's computer and the personal information and browsing history stored therein, has suffered a trespass by Defendant.

55) Plaintiff never consented to and was unaware that Defendant's website was placing software on her computer.

56) Defendant committed common law trespass in violation of Florida law against Plaintiff because Plaintiff did not consent to the placement of tracking and information securing software on her personal computer, which was done without her knowledge and consent.

57) Defendant's trespass has damaged Plaintiff by affecting the condition and value of her computer.

58) On its website, Defendant has an internet privacy policy section that can only be accessed by clicking a barely visible section at the bottom of the page called "Cookies Policy", providing that they use cookies and similar technologies to collect a consumer's information and they obtain non-public information from their users for their own advertising and marketing purposes by placing software on its website that collects a website user's preferences and internet browsing habits as follows:

> Privacy Policy
>
> Last Updated: February 18, 2021
>
> This Privacy Policy explains how information is collected, used and disclosed by Madison Reed with respect to your access and use of our services through our websites and applications, and when you visit one of our "Color Bar" hair color salon

locations. This Privacy Policy doesn't apply to any third-party websites, services or applications that can be accessed through our services.

Any information that is collected is subject to the Privacy Policy in effect at the time such information is collected. We may, however, modify and revise our Privacy Policy from time-to-time. If we make any material changes to this policy, we will notify you of such changes by posting them on our website, and we will indicate when such changes will become effective. The new privacy policy will apply to all current and past users of our website, mobile app, or other services, and will replace any inconsistencies in prior policies. By continuing to access or use our services after those changes become effective, you are agreeing to be bound by the revised policy.

Information You Provide

We will collect the personal information (like your name, email address, phone number) you provide when you register for an account and additional information (like billing information) you provide in connection with the purchase of products and/or services through our website. We also collect personal information from you when you make a booking online through our website, on the phone or in-person for services at one of our Color Bar salons. We may also maintain a record of your product purchases made on our website or at one of our Color Bar salons.

If you create an account using your login from a supported social networking site (like Facebook), we will access and collect the personal information about you that the social networking site allows to be shared (which is based your privacy settings, but may include your name, gender, and profile picture), in order to create your account

for you and better personalize your customer experience. We may collect the contact information of your friends (if you choose to connect your friends, contacts and address book information with your account) so that you can contact these people when you use our services or to refer a friend to our services.

We collect personal information you provide from other sources, including Madison Reed websites, mobile applications, when you call or email us, communicate with us through social media, or when you participate in events or other promotions. This may include, among other things, any photographs or reviews shared with us through social media, the Madison Reed website, or mobile app. We also may obtain information about you from our parent, affiliate or subsidiary companies, business partners and other third party services and organizations to supplement information provided by you. This supplemental information allows us to verify information that you have provided to Madison Reed and to enhance our ability to provide you with information about our business, products, and services.

Note regarding children:  We do not knowingly collect personal information from children. If we learn that we have collected personal information of a child under 13, we will take steps to delete such information from our files as soon as possible.

Note regarding international users:  Your information will be transferred to and maintained on computers located in the United States (or any other country where we operate) and processed there – by providing us with your information, you are accepting and agreeing to that transfer

Information We Collect

We automatically collect certain information when you use our services, like the Internet Protocol (IP) address (if using a browser) or a device identifier (if using a mobile device), operating system, the browser type, referring website information, and your location (if you enable this feature). You can enable or disable location services when you use our services at anytime, through your browser or mobile device settings. We collect this information through our app or by using "cookies" (a small data file that your browser places on your computer that helps us better understand how you interact with and use our services). Most Internet browsers automatically accept cookies and you can instruct your browser, by editing its options, to stop accepting some types of cookies or to prompt you before accepting a cookie from the websites you visit. For the cookies that your browser may not be able to reject, you may be able to opt out of these technologies by visiting the NAI's opt out page at http://www.networkadvertising.org.

How We Use the Information We Collect

We use the information we collect to provide our services (or the information you request), to process and complete any transactions, to respond to your inquiries, to personalize and improve our services and your experiences when you use our services, to monitor and analyze usage and trends of our services, to send you messages about the operation and use of our services, to market our products and services or those of our business partners to you via email and postal mail or via phone calls, and for the

purpose for which the information was collected. For example, when you provide your email address during registration, we may sign you up for our email newsletter.

Opt Out of Communications

If you wish to unsubscribe from marketing email, please click here to notify us. If you wish to unsubscribe from postal mail communications, please email us at optout@madison-reed.com with your full name mailing address, and email address and tell us which information you do not want to receive. If you wish to unsubscribe from text messaging, please follow the instructions in the text message or reply "STOP" to a text message you have received from us. We will take steps to remove you from our communications. Note that you will continue to receive transaction-related emails regarding products or services you have requested. We may also send you certain non-promotional communications regarding Madison Reed and our services and you will not be able to opt out of those communications (e.g., communications regarding updates to our Terms of Service or this Privacy Policy).

Information We Share With Others

We may share your information as described in this Privacy Policy (e.g., with our third-party service providers; to comply with legal obligations; to protect and defend our rights and property) or with your permission.

We may share information about you in anonymous and/or aggregated form with third parties for industry analysis, demographic profiling, research, marketing, analysis and other similar purposes.

Your information may be accessed and used by our service providers who are working with us in connection with the operation of our services (these service providers may have access to your information but only to the extent necessary to perform services on our behalf and are obligated not to disclose that information or use it for any other purposes).

We may share your information (including personal information) with third parties for their advertising and marketing purposes except for your text messaging contact information and preferences. These third parties may contact you in order to provide you with information about their products and services that you may find useful. If you prefer that we do not share your information with these third parties, you may contact us at optout@madison-reed.com with your request as stated above under "Opt-Out of Communications".

We may share information about you if we are (or if we believe we are) required by law or legal process (such as a subpoena, warrant or court order), if we have to respond to a lawful request from legal authorities to disclose such information, or if we need to enforce or apply this Privacy Policy, our Terms or our other policies.

We may transfer and/or provide information about our users in connection with an acquisition, sale of company assets, or other situation where user information would be transferred as one of our business assets.

59)	Due to Plaintiff's disability, she could not understand Defendant's website and she could not give informed consent to Defendant's installation of data and information tracking software

on her computer. Defendant also could not give informed consent to Defendant's collection of her browsing history and the placement of analytics on her computer.

60) Thus, Plaintiff has no adequate remedy at law to redress Defendant's knowing and reckless disregard for Plaintiff's right to exclude others from her computer and determine which programs should be installed and operated on her computer.

WHEREFORE, Plaintiff demands judgment against Defendant for Plaintiff's damages, interest, costs, and such further relief as the Court deems just and equitable.

### Request for Jury Trial

61) Plaintiff requests a jury trial.

Submitted by:

Mendez Law Offices, PLLC
Attorneys for Plaintiff
P.O. BOX 228630
Miami, Florida 33172
Telephone: 305.264.9090
Facsimile: 1-305.809.8474
Email: info@mendezlawoffices.com
By: _____/s/_____
DIEGO GERMAN MENDEZ, ESQ.
FL BAR NO.: 52748

Adams & Associates, P.A.
Attorneys for Plaintiff
6500 Cowpen Road, Suite 101
Miami Lakes, FL  33014
Telephone:  786-290-1963
Facsimile:  305-824-3868
Email:  radamslaw@bellsouth.net
By: _____/s/_____
RICHARD J. ADAMS, ESQ.
FL BAR NO.: 770434